Ms. Umberger? Umberger, that's got it. Thanks. Good morning, Your Honors. In the last case, you heard a lot of discussion of extraordinary, but we do have something extraordinary here today, and that's what the District Court did here. On page 57 of the blue brief, you say, in granting judgment as a matter of law, the District Court also claimed that neither it nor this Court had ever considered whether Example 1, separate from the rest of VITE, inherently anticipated. Did the District Court let you argue that Example 1 was missing any of the limitations and the asserted claims at trial? He did not. The District Court said that while, quote, all agree that VITE does not expressly teach a method of deposit control, that doesn't matter, quote, if the source of the prior art recognizes the inherent result. Assuming that advantages of certain enzymes are later discovered, why should we find that element not met? There's nothing in Example 1 that would inevitably and inherently or always result in the missing claim limitation, which is deposit reduction. It doesn't mention deposit reduction. If you're talking about whether the invention was disclosed before, which is the heart of 102, it was not disclosed in VITE. I'm sorry, for inherent anticipation, it's really not only not helpful, it's a prerequisite for inherent anticipation that the prior art does not mention deposit reduction. That is correct. But I gather, I thought it was undisputed that if you get rid of all the phytic acid and the phytic acid salts, there's not going to be any phytic to deposit because the ingredient is missing. So it was undisputed that phytic acid can reduce phytic acid. I'm not, I'm not, right, right, so I'm not, I want to put aside the question of whether you've got a whole bunch of other stuff in the, in the soup, so that if you reduce it a little, you're still going to have enough to cause the deposit. I mean what Example 1 says is reduce the phytic acid to undetectable levels. If you do that, is it undisputed that at least in the beaker, on the benchtop, in the lab, you can't have deposits of phytate? You cannot reduce the formation of deposits. Of course, you don't know if there were any deposits to be, that were forming at that time because we don't have that evidence here. It was in a glass beaker. The patent talks about how that if you get rid of all the phytic acid and the phytic acid salts, you will have no phytate deposits. Is that disputed? No phytate deposits will form in that glass bottle. Okay, so what concrete variable or factor that exists in a plant would support a conclusion that what Example 1 says happens on the bench might not happen in the plant? Well, first, there's no plant in the world that operates like Vite Example 1. Say something concrete. Big fat can't stir something. Pressure, ethanol concentration, the way that the equipment runs, the equipment. If you're talking about location in more than one place, there's more than one part of the plant. That is correct, which is not shown in Vite. Vite is not done in a plant, so there's no heat transfer equipment, there's no distillation column. But if you do Vite in the pre-heat transfer equipment stage, there will be no phytic acid or phytic acid salts later in the process when you get to the beer column or the other heat transfer equipment. So if you could, in an actual fuel ethanol plant, reduce all of the phytic acid in fermentation, there would be no deposits to deposit downstream. That's not what you're really saying is if Step 1 in the plant was a glass beaker. Because that would be what it would have to be, otherwise it's not Vite. You see what I'm saying? That is correct, but also Vite doesn't have any of that downstream equipment. Yeah, but unless you had Step 1 in any plant being a glass beaker, I don't see how Vite applies. I agree, and it's not just that it's a glass beaker, it's that you're putting it in a pre-saccharification step, a very high temperature pre-saccharification step that is not used by any plant. We don't have any evidence about if you took the example of, took example one, actually put it in a plant, what would happen? I thought there is some evidence. Didn't the other side say that it gave its stuff to various plants and this is what happened? I realize zero evidence is not the standard, but I thought you just said there is no evidence. Didn't they say the accused product, we gave it to some plants and got rid of all the infringing plants, and this is the only evidence they have. They didn't do any independent testing, but what they said is, well, we know that the infringing plants got deposit reduction when they used Vitease in the fermenter, which is not example one. When they used certain dosage, and they talk about overlapping dosages, in the fermenter, in the plant, we know that they got deposit reduction. But there's lots of different variables, which their own expert concedes, admits that there's many variables, and you have to land on this right combination of these variables. What variable that's not listed in example one might change the result when you don't use a glass beaker, but do it in a plant? First, there's a presence of metal. We don't know what that will do. Did your expert testify to that? I'm sorry, did your expert testify to that? I don't think the expert testified. They testified it's specific equipment. Yes, they said you need to know what the equipment is in the plant before you would know whether or not Vite, example one, would work. I believe their expert also testified when asking what amount of Vitease would reduce deposits enough that you would actually see a reduction in deposits, and he said, without going through those variables and fixing them at a particular site, knowing where the system wasn't before. Let me just try to tell you what I'm confused or uncertain about. Much of the testimony that you cite, at least, is at a very high level of generality, not specifically focused on example one. And since example one is the only thing that matters here, it's not helpful in my current way of thinking about it to say, well, if you do stuff that's not example one, who knows what you'll get? The question is, if you do example one, with the one difference being you take it out of the beaker, off the lab bench, and put it in the plant, and the claim doesn't say where in the plant. Some of the claims, I think, it's what the 137, one of the patents doesn't even use the term plant. 137 doesn't, and 399 does, or 399 doesn't. The claims that issue, right? I believe both patents use the term fuel ethanol equipment. They do, but only one of them uses plant. Was any argument about that difference made in this litigation? It was not. Okay, so let's assume plant is in the picture. If you take example one with the pH and the temperature and the proportion, and put it in some fuel ethanol equipment in a plant, what fact about that change might lead a jury to conclude, what concrete fact, that under no circumstances, or I'm sorry, that you won't get the same result that you got on the bench, which is all the phytic acid gone, as a result of which, no matter what happens downstream, you're not going to get phytic acid-caused deposits, because the material is not there. So if I understand your question correctly, you're saying if you basically took the material from example one, and dumped it into the plant. No, you take material meeting the conditions specified in example one, both the you put in at a temperature and the pH quality of the soup. What is it about changing some fact? Maybe it's the metal. Maybe it's the metal in that. Maybe it's that you can shake a beaker and get it nicely distributed, and you can't shake a giant, giant vat, or the mixing is not. I'm looking for something specific to understand why that might not be the same result. Getting rid of all the phytic acid. So I think you'd get rid of all the phytic acid in the plant at that point. What fact about plant equipment might lead you to doubt that you will get rid of all the phytic acid if you do everything that example one specifies? Well, I think it's just unknown, because we don't know what would happen. What fact might make it unknown? The fact that you're putting this in a high temperature pre-securification step, and you're letting it ferment. Doesn't example one specify temperature? It does specify temperature, yes. Okay, so that example one, is there some evidence that says that temperature won't necessarily produce the same result in the plant? Again, you're focusing on a specific temperature, which is one operational parameter among many that you have to get just right and in the right combination to see. Example one says that at least in the lab, that's just right. Why is it not just right in the plant? One, there's no evidence on that. Two, there's ethanol concentration, which our expert talks about, that can impact the effect of phytase and whether or not it reduces phytic acid deposits. There's pressure in the plant, and we don't know what pressure this was put under in the plant. Again, I would go back to, then you're not in example one anymore. You're invoking obviousness. There's nothing in example one, there's no one example that has all the limitations of the plants. In the pH of 4.5, the pH is very important. What we talk about is the pH in the beer column. There's nothing in example one that even talks about a beer column, much less what the pH in the beer column is, which is a limitation of some of the plants. I do want to talk about something that went to your point, which is, what did Novozyme say about example one? Because it's their burden to prove inherent anticipation by clear and convincing evidence. Here, this court has already addressed this issue and said we had evidence of that. More importantly, the district court overturned the jury's verdict. You have to say, was there no reasonable evidence whatsoever that the jury could have found that Novozyme didn't meet its burden? You ask a lot of good questions. It's Novozyme's burden to prove that vite will always and inevitably deposit. We don't have to prove the opposite. It doesn't actually have to prove that vite will always and inevitably. What it has to prove is that example one, if followed in a plant, will always get rid of all the phytogasm. So it's really quite irrelevant that doing other stuff in vite won't inevitably do it. So I would say two things to that. One, this is like the Paracone case. Where in Paracone, they said, the question is not whether if you applied this lotion to sunburned skin that it would actually treat the sunburned skin. Did the reference itself apply that lotion to sunburned skin? And it didn't. And the court said it's not inherently anticipated if that was not met. And again, here, it should be a high burden. Because you're talking about 102. You're talking about prior invention of something that is not expressly disclosed. So it should be a high burden. And it is a high burden. And as I said, it's like Paracone. So that's my first point on that. My second point on that is that, again, these variables are very important. And their expert even conceded that you have to have exactly the right combination. So you're really picking and choosing from other parts of vite in terms of, if you scale this up to a plant, will it inevitably and always reduce deposit reductions? And their expert does not say, if you scale this up, example one, to a plant, you will always inevitably get deposit reduction. It does not say that. What he says is, going through the teachings of vite, following the practices of vite, specifically adding phytase to fermentation. He says that twice on appendix 2640. If you add phytase into fermentation, you necessarily reduce the phytic acid deposits in the plant. That's not example one. So we don't even have testimony that says, you take example one and scale it up into a plant, you'll always and inevitably get that deposit reduction. And on that record— We are way over in your rebuttal time. Oh, I apologize. Need to save some. Thank you. Let's hear from the opposing counsel. Mr. — is it Haddon? Yes. I plead the court, Dave Haddon, for no dissent. You're right, Your Honor. This is all about example one. So where is example one applied in a plant? Well, the whole disclosure of vite, figure one is an ethanol production plant. Where is example one applied in a plant? Well, example one uses corn mash from a plant at the temperatures that it would be used at in pre-sacrification in a plant, using the same enzymes that you use in a plant. It is then fermented for 96 hours, like you would do— So there are plants then that use a glass beaker at that temperature and they don't have any problem. Is that correct? No, Your Honor. The issue in vite is demonstrating how you would use phytase in an ethanol plant. That's the purpose. That's what the patent is about. Example one is not a science fair project. Example one is to demonstrate how you would use phytase in ethanol production. And it uses the conditions that you would have in a plant. Of course, it's done in a laboratory. Chemistry is done in a laboratory. But the point of doing it in a laboratory is to show what would happen in the plant. And there was zero evidence at trial that example one would not work in a plant. It really wasn't their burden. No, I understand that, Your Honor. So why isn't it enough, even if— said and what all the evidence was— but even if their witnesses did not specify any concrete condition in a plant that would— and say this condition, even if you did everything else in example one, would still not tell you that all the phytic acid is gone. Why isn't it enough for the jury to say, we just have uncertainty about NovoCyme's expert testimony on that subject, and we're not persuaded? Well, two points, Your Honor. The first is that both of U.S. Water's experts conceded that if example one was correctly reported, there would be no phytate deposits in a plant. That's what Dorn said, and it's at 29728 of the appendix, and Flanagan said it at 3047 of the appendix. I'm sorry, who did Dorn and Flanagan belong to? Flanagan were the two U.S. Water's experts. Okay. So they acknowledged that. 2972, and what was the other one? 3047. Thank you. The other point, Your Honor, is that the only evidence that was presented in U.S. Water's affirmative case about example one, and this is important, was not that example one would not work. What Mr. Flanagan said was that example one was 200 times the dosage of the smallest dosage in the bite pack. And this comes back to what the jury was told. The jury was told repeatedly by U.S. Water's that it didn't matter whether example one worked because to prove inherency, no design would have to prove that every dosage, including the smallest .005 dosage, would have to necessarily reduce deposits. That's what the jury was told over and over again. They were told that by Mr. Flanagan, and he said it because that's what U.S. Water's counsel told him the law was, which we all know is not the law. Importantly, in their closing argument- Where does he say that? Excuse me? Mr. Flanagan testified, and this is at 3047 lines 22 to 3048 line 1. He says, quote, So the advice I was given by counsel, whether it necessarily would have to happen, was that yes, any of these ranges and any of these enzymes would necessarily have to result in what was disclosed in the U.S. Water's patent. So throughout the case, Flanagan and U.S. Water's argued not about example one, but about the .005 dosage. And it's clearest in closing where they testified, example one from bite is about putting phytase into sacrification, not into the fermenter. Now that is irrelevant, as John noted, because the claim was construed to cover adding phytase at any step in the process. He then goes on and says, More importantly, this example is 200 times the lower range of bite, right? Is it clear and convincing to come in here and tell you that, well, because 200 times if something works, just one of it would as well? That's a wild guess. That's not clear and convincing. So there's no dispute that example one would work. Their argument was example one did not prove that the lowest dosage, the .005 dosage, worked. I'm not sure that the two pages that you mentioned before, 2972 and 3047, say that if you did example one in a plant, you'd get rid of all the phytic acid. I thought they are just answers to the question, if you get rid of all the phytic acid, then will you have no phytate? Answer, well, yeah. Well, they were asked, Mr. Flanagan, if all of the reporting is correct, he's referring to the reporting of example one. He doesn't say anything about moving it from a beaker and a bench to a vat in a plant. He's talking about what would happen in a plant if the reporting of example one is correct. Where's the in a plant part? And are we on 3047 or 297? Let me just find the right thing here, So he's asked, Mr. Flanagan, if you accept what is expressly stated in VITE, which is we hydrolyze the phytic acid below detection levels, do you agree that no phytic acid deposits can form in those circumstances? He says, yes, there'd be nothing to deposit. So if the issue is, does the reaction... That's a non sequitur. What's that have to do with a plant? Well, if there's no phytic acid, there can be no deposit on downstream. Let me ask you a hypothetical. If phytic acid didn't exist, it wouldn't be a problem, would it? Correct, Your Honor. And both VITE and later US Waters proposed the same solution to eliminate phytic acid from the ethanol processing fluid. Let me go to this question. The issue seems to be because VITE example was done in a glass beaker, somehow it's not indicative of what would happen in a metal tank. There is no evidence of that. And in fact, the evidence is just the opposite. How do we know that? We know that because US Waters patent, right? Their proof of the fact that they can get rid of deposits with phytase was to perform an experiment in a test tube. They put phytase in, they look at the test tube, they said the test tube is clear, there's no precipitation, so therefore you're not going to get deposits. There's nothing in the US Water patent that says you do something different in a plant. There's nothing in the US Water patent that says you do something different with beer columns or metal or anything else. The other key point is in the US Waters patent itself, it defines the unit of phytase to use, right? The phytase unit is defined by how much phytate it eliminates from the solution, right? Think about that. You're defining the unit by its efficacy. This is the FTY measure? Yes, and both patents have a similar definition. But the patents in suit have specific conditions disclosed. Those are exactly the same conditions that are used in Example 1. They are temperature, they are pH, and they are dosage. Those are the same conditions that are specified by VITE Example 1. And as the district court found, the conditions in VITE Example 1 are within the ranges that are disclosed in the US Water patent. But the point I was getting to, Your Honor, is if you're going to define the amount of phytate, by how much phytase, by how much phytate it destroys, right? That amount cannot depend on whether you're doing the reaction in a metal tank or a glass beaker or a test tube, right? Their own patent, by defining that unit, is confirming that the chemistry works the same wherever you're reacting it, right? Otherwise, that is nonsensical. And it is consistent with the patent itself, which does the experiment in a test tube. You put it in this, if you want to see where this definition is, I can point you to it, but it's in the, you know, it's how VITE- You say the VITE definition? It's defined both in the VITE patent and in the US Waters patent. They both define them by the efficacy of the phytase in dissolving some amount of phytic acid, right? So their own units- Is that right? I thought it's the amount of enzyme that liberates a certain amount of inorganic orthophosphate per minute, right? So it's not defined in terms of how much- Right, it's how much it dissolves per minute under these certain conditions. Right, but that's not necessarily tied to how much deposit there is. No, what I'm saying is-  My argument is that the reaction, how effective the phytase is in removing phytate, cannot depend on whether it's happening in a metal tank, in a plant, or in a beaker, because the unit that they define is based on this effectiveness. So the reaction has to work the same, but that definition doesn't make any sense, right? How can you use a unit that depends on whether you're in a metal tank or a plastic bottle? Let me ask you this. In the Red Brief at 16 and 17, you say that U.S. Water asserts that a material dispute of fact existed as to essentially our six remaining elements. I can go through the whole thing for you if you want. No, that's fine, go ahead. Did they argue at the summary judgment stage that the prior art lacked several claim limitations? No. So let me be clear on this, and this goes to the 4.5 pH, which is a non-issue, because example one specifies 4.5 pH. Well, it goes to a number of elements, right? But the only issue in this JMAL is the reduction of deposits, because that's the only issue that went to the jury, right? The lower court below found, as a matter of law, that all the other elements of the claims were met by bite, and so the jury was not even asked or instructed to decide those elements. So if U.S. Waters had an issue with that, the remedy was to ask for a new trial, but it's irrelevant to the JMAL for your honors today, because the only issue for the jury was the reduction of deposits. Can I ask you this question? If we were to conclude that the district court's JMAL was wrong, about this anticipation question, the blue brief ends by saying, reverse the JMAL and reinstate the verdict. Your conclusion in your red brief is, don't reverse, affirm. Is there something left to be decided when that case returns? Yes, there's other post-trial pending motions. So notice I moved for a new trial based on the arguments that U.S. Waters made that were contrary to the law, right? They argued and put on evidence that every embodiment in fight must reduce deposits. That was their case throughout. That was improper. We objected. We moved for a new trial on that grounds as well. The judge ruled that is moot, given the JMAL that he granted. The judge ruled on anticipation and obviousness. Was there a written description, JMAL, also not ruled on? If I remember correctly, he only moved on the anticipation, instead of everything else was moot. We knew it ruled on obviousness. OK, you got it better than me. But I want to go back to the main point, which is the U.S. Waters patent proves its efficacy in a test tube. The experiment in bite example one is a more precise experiment done under conditions that mirror what's done in a plant, that are based on the description of an ethanol processing plant that is figure one in bite. There was no evidence presented at trial that somehow the chemistry would work differently. In fact, Mr. Dorn says the basic chemistry works the same. The only argument at trial was the legally incorrect one, that example one doesn't prove that the smallest dosage necessarily works. That was their argument. They did not put on any expert evidence that would distinguish example one and say example one doesn't work because it's a metal tank instead of a glass. And so if you put aside that the legal arguments are just flat wrong and that they admit are wrong today, there is no evidence that bite example one does not anticipate. It does exactly what the U.S. Waters patent did. It did it before and it measures the result more precisely. I see my time is up. All right, I think. Thank you. You have a little bit of rebuttal time left, Ms. Umberger. We'll give her two minutes, please. Thank you, Your Honor. First, I want to say there's no evidence that any plant in the world operates like bite example one. Opposing counsel said that it was it mirrored a plant and that it was the same conditions as in a plant. It's not. We have no evidence that any plant uses a precarification step at high temperatures like in example one. There's fermentation of 96 hours. There's no evidence that any plant uses a fermentation step at 96 hours. It's usually 30 to 60 hours. And the pH of 4.5 that's discussed in the patent is the beer column and not in the in the mash. I would note that the Novozymes expert did not say, nor did our experts admit, that the conditions of example one would ever, much less always, reduce deposits if applied in an actual fuel ethanol plant. No, what they said was, if it worked, it would do it. In other words, yes. Circular. Circular argument, yes. Finally, I want to say, don't forget that it's Novozymes. Because, you know, you may have, it's not a fresh look at what the evidence is. Was there any reasonable basis here for the jury to find as it did? And we ask that the jury verdict be reinstated. Thank you. Do you agree that there are unruled-on motions if we were to reverse the JMO? I do agree there are unruled-on motions. Obviousness and anticipation were the only thing. So I just want to go back to this metal tank. That's not the only difference and that's not the issue. It's all the other issues that I pointed out and our experts pointed out between the differences between how a plan operates and what example one states. Thank you. Okay. I thank both counsel. The case has taken over submission. All rise.